UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                    :    Chapter 13

LEIGH M. FOLEY a/k/a LEIGH M.            :
SEWELL
          Debtor                         :    Bankruptcy No. 07-16433bf

..................................................

MEMORANDUM

..................................................

Before me are several related contested matters: first, the standing chapter

13 trustee has moved to dismiss this case; second, the debtor requests confirmation of a

second amended chapter 13 plan of reorganization, to which creditor Option One

Mortgage Corporation and the trustee object; and third, the debtor objects to the secured

proof of claim filed by Option One.

In essence, Ms. Foley contends that the secured claim of Option One must

be reduced significantly, which reduction, she opines, renders her proposed second

amended plan confirmable. Option One strongly disputes that its claim should be reduced

and relies, in part, upon a decision rendered in its favor by the District Court; moreover,

Option One and the trustee contend that the debtor cannot even afford to tender the

payments proposed by her second amended plan, rendering that plan infeasible. Finally,

the trustee argues that the debtor has had sufficient opportunity to reorganize and, given

her inability to do so and desire to seek appellate review of the District Court decision,

this case should now be dismissed.  The debtor opposes dismissal.

Upon consideration of evidence presented and review of the memoranda

submitted by the parties, these contested matters are ripe for adjudication.

The following facts were proven or are the proper subject of judicial notice

under Fed. R. Evid. 201, incorporated by Fed. R. Bankr. P. 9017.


I.


A.


Ms. Foley[1] filed the instant chapter 13 bankruptcy case on November 1,

2007.  She resides at 1727 Tucker Avenue, Abington, Pennsylvania in one residential unit

with her three children, while her mother lives in the other unit of the same building.

N.T. at 14-15.  She purchased the Abington property in 2005 with her grandmother, Ms.

Dorothy Engleman, from her great aunt, and now believes that she co-owns it with her

grandmother's estate.[2]  Id.

---

[1]The debtor's last name changed from Sewell to Foley on July 7, 2007 as a result of
divorce.  N.T. at 18.

[2]The debtor's grandmother passed away after the purchase of the property.  No evidence
was submitted of the manner of joint ownership by Ms. Foley and Ms. Engleman: e.g., whether
as joint tenants with right of survivorship or as tenants in common.  Nor is there any evidence
concerning the disposition of Ms. Engleman's interest in the realty upon her death.  No party
addresses that issue so I will assume arguendo that it is immaterial in these contested matters.

On November 12, 2007, the debtor filed her initial proposed chapter 13 plan. This proposed plan called for the debtor to tender $250 per month to the bankruptcy trustee for 60 months (totaling $15,000). The plan also provided that the debtor would tender regular postpetition monthly mortgage payments while litigating the validity of the mortgage in federal district court. To the extent the debtor's mortgage was in arrears prepetition, the proposed plan did not expressly provide for curing that arrearage under section 1322(b)(5).[3]

The debtor's initial proposed chapter 13 plan also purported to "fix" the value of two automobiles owned by the debtor and to repay that value in full, with interest, over 24 months. Allowed unsecured claims would be paid pro rata from any funds paid to the trustee that were not paid to secured and priority creditors. This plan also required payment of $2,024 in attorney's fees to debtor's counsel as a priority administrative expense.

In support of her initial proposed plan, the debtor filed Schedules I and J. Therein, she disclosed that she was married and supported three minor children as well as her grandmother. The combined income of the debtor and her spouse was reported to be

---

[3]Instead, the proposed plan stated that after pending federal district litigation between the debtor and Option One was determined, the debtor and the mortgagee would determine "how any arrears found to be due would be repaid," with such payments tendered directly to the mortgagee and not to the trustee. The proposed plan did not contain any provision for resolving a dispute between the debtor and mortgagee if a consensual repayment arrangement was not reached.

$4,545.43, and their monthly expenses were $4,295.00, leaving net monthly income of only $250.43. On Bankruptcy Form 22C, the debtor disclosed her monthly disposable income as $165.43, and her applicable commitment period to be five years.

The debtor's initial proposed plan generated written objections from Option One and the two automobile lenders: HSBC Auto Finance, and Hyundai Motor Finance Co. The debtor then entered into a stipulation in January 2008 with Hyundai Motor Finance, in which she agreed to modify her chapter 13 plan to require her to tender monthly contractual auto loan payments directly to Hyundai Motor Finance while paying her pre-bankruptcy contractual arrearage sum to the chapter 13 trustee. (Neither amount was specified in the stipulation.)

In March 2008, the chapter 13 trustee filed a motion, later amended, to dismiss this case due, inter alia, to the debtor's failure to tender the payments promised by her proposed chapter 13 plan, and because the proposed plan did not call for payments sufficient to pay allowed secured claims that were to be provided for by the debtor's plan. The trustee then agreed with the debtor's request to postpone the confirmation and dismissal hearings, based upon her counsel's representation of her ill health.

In June 2008, the debtor filed an amended plan by which she proposed to tender to the trustee only a total of $1,000 through June 2008; thereafter, she proposed to tender monthly payments of $750 for 53 months for a total plan payment of $40,750.00. This amended plan include payment of contract arrearages to the mortgagee and the two

4

auto loan creditors. The Pennsylvania Department of Revenue was identified in the plan

as holding a priority claim in the amount of $1,398.24, which was to be paid in full along

with debtor's counsel fee.

Less than two weeks later, the debtor filed a second amended plan, which

plan is presently before me for purposes of confirmation.

In her second amended plan, Ms. Foley proposes to pay the trustee $1,000

through June 2008, and then pay $500 per month for 53 months beginning in July 2008,

for a total of $27,500. As for the claim of the mortgagee, Option One, the proposed plan

states:

> The Debtor and her late grandmother by her personal
> representative ("the Borrowers") have rescinded the loan
> made by them and presently owned by Deutsche Bank
> National Trust Company ("DBNTC") held or serviced by
> Option One Mortgage Corp. ("OOMC"), the first mortgagee
> on their duplex located at 1727 Tucker Ave., Abington, PA.
> 19001 ("the Home"), and they are involved in litigation in the
> United States District Court and an appeal to the Third Circuit
> Court of Appeals in an effort to enforce their rescission rights
> against DBNTC/OOMC. The Borrowers will make their
> regular post-petition mortgage payments directly to OOMC.
> The Debtor will pay the full allowed arrears to
> DBNTC/OOMC through her trustee payments. She will
> amend the plan to reflect the amount owed to
> DNBTC/OOMC after the outcome of that litigation in federal
> court and of her claims objection filed in this court.

Second Amended Plan, ¶ 3.

Ms. Foley also proposes to make her regular post-petition payments and

cure the arrears owed on automobile loans held by Hyundai Motor Finance Co. and

5

HSBC Auto Finance. Id., at ¶ 4. The second amended plan identifies the debtor's

attorney and the Pennsylvania Department of Revenue as holding priority claims totaling

$3,422.24, which are to be repaid in full from distributions under the plan. Dell Financial

Services is also identified as a secured creditor to be repaid $200 under the plan. Again,

unsecured creditors are to be paid pro rata from any funds remaining after secured and

priority creditors are paid. (The unsecured claims for which proofs of claim were filed in

this case total $7,262.73. See Claims Register.)

After this second amended plan was filed, Ms. Foley entered into a

stipulation with Hyundai Motor Finance, resolving that creditor's pending motion for

relief from the automatic stay. In this stipulation, she acknowledges a post-petition

delinquency of $1,666.68, plus an obligation to reimburse Hyundai Motor Finance for its

attorney fees and costs of $300.00. See docket entries ##73 and 81. She promises in this

stipulation to pay Hyundai Motor Finance $656.35 each month from July 2008 to

December 2008, which includes her regular monthly payment of $395.24. Thus, Ms.

Foley has committed to pay $261.11 in addition to her contractual car payments for six

months.

On July 16, 2008, the debtor also entered into a stipulation with HSBC,

agreeing that this auto lender holds an allowed secured claim of $11,317.47 (inclusive of

interest), which secured claim shall be repaid in full through the debtor's chapter 13 plan.

6

See docket entries ##74 and 83.[4]

On the same date in June 2008 that the debtor filed her second amended

plan, she filed amended bankruptcy schedules of income and expenses. On amended

Schedule I, she revealed that she presently is separated from her husband and does not

have his income to contribute to her chapter 13 plan. Her net monthly income was

reduced to $3,220.42. She no longer listed her grandmother as a dependent, but does still

support three minor children.

Her amended Schedule J disclosed that her monthly expenses now are only

$2,720, leaving $500.42 as available to pay to the trustee. These expenses, however, list:

only one car payment of $395 (presumably owed to Hyundai Motor Finance); no monthly

expenditures for home maintenance, clothing, laundry, or recreation; only $350 per month

for food for herself and her children, and $40 per month for transportation (exclusive of

loan payments). Moreover, her amended Schedule J reflects a decrease in monthly

expenses for cable and internet, food, medical and dental, transportation, and real estate

taxes from the original schedule of expenses filed at the outset of this case. At the

hearings held, the debtor offered no explanation for such decreases.

---

[4]The second amended plan does not specify amounts to be paid to creditors, except the
priority creditors. As HSBC has not objected to the second amended chapter 13 plan, I infer that
HSBC believes that the debtor's proposed second amended plan is consistent with the parties'
stipulation, and thus this creditor would receive distributions to it totaling $11,317.47.

B.

Insofar as the debtor's mortgage obligation is concerned, the debtor and Ms. Engleman (her grandmother) executed a 30 year Adjustable Rate Note and accompanying mortgage dated April 1, 2005, with Option One Mortgage Corp. as mortgagee, for a principal loan amount of $134,400, with an initial interest rate of 8% and providing for a interest rate change on May 1, 2007 and every six months thereafter at the Libor Index plus 5.35%. Exs. D-2, ¶¶ 2, 4,[5] M-1.[6]

The promissory note required the debtor and her grandmother to tender initial monthly payments in the amount of $986.18. After the interest rate was adjusted as of May 2007, I find, based upon the evidence presented at the hearing, that monthly note payments increased to $1,245.26 beginning with the June 2007 payment. See N.T. at 39.

Mortgage payments were due on the first day of the month and were late if not paid within 15 days. Ex. D-2, ¶¶ 3, 7. Option One was entitled to charge a late fee of 6% of the overdue payment of principal and interest. Id., at ¶ 7.

By a preponderance of the evidence, I find that the debtor tendered the

---

[5]The note limits the extent that the interest rate could adjust, and also contains a ceiling of 14% and a floor of 8%. Ex. D-2, ¶ 4.

[6]In its proof of claim, Option One identifies itself "as servicer for Deutsche Bank National Trust Company, as Trustee for the Certificateholders of Soundview Home Loan Trust 2005-OPT1, Asset-Backed Certificates, Series 2005-OPT1." The mortgage and note attached to the proof of claim reveal Option One as the mortgagee. As only Option One has participated in these hearings, for the sake of simplicity I will refer to Option One as the mortgagee.

8

following mortgage payments to Option One between June 2005 and September 2006.

(The monthly payment due during this period was $986.18.)[7]

| Due date | Date paid | Amount paid | Citation |
|---|---|---|---|
| June 1, 2005 | July 14, 2005 | $1,000.00 | N.T. at 22, 31 |
| July 1, 2005 | August 2, 2005 | 972.36 | N.T. at 23, 31 |
| August 1, 2005 | August 22, 2005 | 1,064.00 | N.T. at 23, 31 |
| September 1, 2005 | September 26, 2005 | 1,145.00 | N.T. at 24, 31 |
| October 1, 2005 | October 24 or 25, 2005 | 1,045.39 (check returned NSF) | N.T. at 24, 31 |
| November 1, 2005 | November 22, 2005 | 986.18 | N.T. at 25 31 |
| December 1, 2005 | December 19, 2005 | 1,000.00 | N.T. at 25, 31 |
| January 1, 2006 | February 13, 2006 | 3,000.00 | N.T. at 26, 31 |
| February 1, 2006 | March 28 or 29, 2006 | 1,100.00 | N.T. at 26, 32 |
| March 1, 2006 | end of April 2006[8] | 1,000.00 | N.T. at 26, 32 |
| April 1, 2006 | July 10, 2006 | 1,000.00 | N.T. at 27, 32 |
| May 1, 2006 | August 29, 2006 | 1,000.00 (check returned NSF) | N.T. at 27, 31, 32 |

---

[7]Neither Option One nor the debtor offered any documentary evidence regarding payments. Counsel for Option One cross-examined the debtor from records in his file and she largely agreed that the information contained in his records was accurate.

[8]Ms. Foley stated that she might have missed a payment after her April 2006 payment, such that her next payment was made July 10, 2006. N.T. at 27. However, later in the hearing Option One's counsel inquired about her having made a payment on May 8, 2006, to which Ms. Foley agreed. N.T. at 32. As this inquiry followed recital of Ms. Foley's making a payment on March 28, 2006, and preceded recital of her July 10, 2006 payment, it appears that the "end of April" and the May 8th payment are the same.

9

| June 1, 2006 | September 11, 2006 | 986.18 | N.T. at 28, 32 |
| July 1, 2006 | September 25, 2006 | 986.18 | N.T. at 29, 32 |

Ms. Foley acknowledged that her October 2005 and August 2006 checks to the mortgagee were not negotiable due to lack of funds. N.T. at 31, 32. She additionally admitted that many payments were not timely tendered. N.T. at 36-38. In addition, it appears that she did not tender her August and September 2006 payments.

The total of mortgage payments due between June 2005 and September 2006 was $15,778.88. The total of mortgage payments actually tendered by the debtor during the above-referenced period was $14,239.90. Thus, she was delinquent $1,538.98 in mortgage payments through September 2006. In addition, late fees were warranted for every month during this period—$59.17 on the $986.18 payments—adding an additional $946.72.[9] Therefore, her total mortgage delinquency at the end of September 2006 was at least $2,485.70.

Ms. Foley also acknowledged that after Option One filed its foreclosure action in November 2006, it stopped accepting her mortgage payments. N.T. at 29. From October 2006 through May 2007, she owed eight payments of $986.18, totaling 7,889.44, plus $473.36 in late fees. In June 2007, I find, based upon the evidence at the hearing, that the monthly mortgage payment increased to $1,245.26. The five payments due between June 2007 and October 2007 total $6,226.30, plus $373.58 in late charges.

---

[9]The February 13, 2006 payment of $3,000 almost brought her current.

There was no evidence that any payments were tendered and accepted by Option One between October 2006 and October 2007. Accordingly, based upon the limited evidence presented, I find that Ms. Foley paid $14,239.90 from the inception of her mortgage loan to the date of her bankruptcy filing, where $31,668.28 was due (including late charges), a $17,448.38 delinquency.

The debtor testified that the monthly mortgage payments made by her did not include any escrow for real estate taxes. N.T. at 32-33. Ms. Foley testified that she paid the 2005 county taxes as part of her real estate settlement when her interest in the home was obtained, and that she made an arrangement with Portnof Law Associates (presumably a collection agent) to pay $800 per month for her 2006 Abington School District taxes. N.T. at 33-36, 42; ex. D-5 (ex. C, line 1502). No written corroboration of this agreement was presented at the hearing.

The mortgage provided that escrow payments were to be made to Option One for taxes and assessments, and hazard or property insurance. Ex. D-1 (mortgage), ¶ 2. Thus, Ms. Foley allowed, Option One may have paid the 2006 realty tax payments to the local taxing authorities. N.T. at 18, 43-44. This included $1,921 for 2006 county taxes, $3,787 for school taxes, and $3,456.43 to Portnof Associates. N.T. at 43-44.

Ms. Foley resumed mortgage payments to Option One after she commenced this bankruptcy case on November 1, 2007, making at least five payments of $1,000 each between November 2007 and April 2008. N.T. at 29-30.

11

Option One Mortgage Corp. filed a secured proof of claim, docketed on the claims register at #4, averring a total of $164,870.95 due to repay this loan in full, including $33,087.13 in arrears. Therein it avers that the arrearage claim is made up of the following:

```
monthly payments      . . . . . . . . . . . $26,497.80
accrued late charges. . . . . . . . . . . . . . 1,342.59
escrow shortage       . . . . . . . . . . . . . 1,763.22
NSF fees              . . . . . . . . . . . . . . . . 60.00
property inspections/corporate advance.. . 96.00
BPO fees              . . . . . . . . . . . . . . . 170.00
interest on escrow advance. . . . . . . . . . 635.16
prepetition legal fees and costs. . . . . . 2,522.36
```

The arrears include $2,522.36 in attorney fees that Option One claims are part of its reasonable costs associated with Ms. Foley's prepetition mortgage default, assessable in accordance with paragraph 7(d) of the Adjustable Rate Note. Ex. D-2. That paragraph states "If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law, whether or not a lawsuit is filed. Those expenses include, for example, reasonable attorneys' fees." Id. Option One did not offer evidence concerning NSF fees, property inspections/corporate advance, or BPO fees. Nor did it offer any documentary evidence in support of its legal fees and costs.

Ms. Foley disputes all of the fees and costs included on the proof of claim, but did not offer any specific evidence challenging their validity or amount. See N.T. at

12

11-13. For example, she objects to the escrow shortage sum as unclear and "appears

excessive." Debtor's Objection, ¶ 4. Fees for property inspections, corporate advances,

and BPO fees are "not clearly itemized, unclear, and appear excessive." Id. And interest

on escrow fees, advance fees, and legal fees are objected to as "unjustified and

excessive." Id.


C.


Ms. Foley also disclosed a pending lawsuit in foreclosure brought by

Option One against her in Montgomery County Court of Common Pleas, and a lawsuit

brought by her against Option One (and others) pending in the District Court for the

Eastern District of Pennsylvania. See Statement of Financial Affairs, #4. The lawsuit

pending against Option One in the District Court is captioned Sewell v. Option One.

In federal district court, Ms. Foley and her grandmother sued Option One

and others, including Old Guard Mortgage and Financial Services, Inc. See ex. D-5. In

Count One, the plaintiffs alleged that they did not receive accurate disclosures of the

terms of their mortgage transaction, were not provided with the requisite number of

copies of the Notice of Right to Cancel their loan, and that the mortgagee wrongly refused

to rescind the transaction upon their request, in violation of the Truth in Lending Act, 15

U.S.C. § 1601, et seq. Id. Accordingly, they requested in this civil action that Option

One be directed to rescind the transaction and be liable for statutory damages of $2,000,

plus attorney's fees and costs. Id. In Count Two of their complaint, Ms. Foley and Ms.

Engleman alleged that Option One did not respond to their qualified written requests for

information, thereby violating RESPA, 12 U.S.C. § 2605(e), (f), and rendering Option

One liable to the plaintiffs for $1,000 in statutory damages, fees and costs. Id. The

plaintiffs' third and final count is alleged against Old Guard only, and involves a failure

to provide certain disclosures in violation of Pennsylvania consumer protection statutes.

Id.

Last December, the District Court for the Eastern District of Pennsylvania

granted in part a motion to dismiss filed by Option One, thereby dismissing Count One

against it (but denying dismissal of Count Two without prejudice to renewal in a

summary judgment motion following the close of discovery). Sewell v. Option One

Mortgage Corp., 2007 WL 4355393, at *1-*2 (E.D. Pa. Dec. 12, 2007). In dismissing

Count One, the court stated:

> Plaintiffs' complaint alleges that Option One violated TILA
> by not providing each plaintiff with two copies of the Notice
> of Right to Cancel (plaintiffs now concede that they received
> two copies of this document). Complaint, ¶ 7. However, as
> set forth in the complaint, Sewell obtained her interest in the
> property as part of the transaction at issue, which rendered the
> transaction a 'residential mortgage transaction' excepted from
> the right of rescission under TILA.

Id., at *1.

In other words, the district court held that the transaction by which Ms.

14

Foley obtained her interest in the Abington realty was not one entitled to relief of loan

rescission under federal TILA.  The court further found that none of the other allegations

in Count One constituted violations of TILA; therefore, neither rescission of the mortgage

nor statutory damages were appropriate.  Ms. Foley's proposed second amended plan

states her intention to appeal from this decision.  See also N.T. at 20.


II.


A.


I turn first to the issue of confirmation of the debtor's second amended

chapter 13 plan of reorganization.

At the outset, I note that the debtor has the ultimate burden of persuasion

that her proposed chapter 13 plan meets all the statutory requirements for confirmation.

See, e.g., In re Hill, 268 B.R. 548, 552 (B.A.P. 9th Cir. 2001) ("The debtor, as the chapter

13 plan proponent, has the burden of proof on all elements of plan confirmation."); In re

Heath, 182 B.R. 557, 560 (B.A.P. 9th Cir. 1995) ("In general, the debtor carries the

burden of proving, by a preponderance of the evidence, that the plan complies with the

statutory requirements of confirmation."); In re Weisser, 190 B.R. 453, 454 (Bankr. M.D.

Fla. 1995); In re Norwood, 178 B.R. 683, 687 (Bankr. E.D. Pa. 1995); see also In re

Ziegler, 88 B.R. 67, 69 (Bankr. E.D. Pa. 1988). While this burden is lessened when the

chapter 13 trustee recommends confirmation, see In re Hines, 723 F.2d 333 (3d Cir.

1983), the trustee has made no such recommendation in this instance. Furthermore,

whether or not a specific confirmation objection has been made, this court and the chapter

13 trustee have the right to independently determine that the debtor's plan meets all

statutory requirements based upon the evidence presented at confirmation. See In re

Szostek, 886 F.2d 1405, 1414 (3d Cir. 1989).

Among the requirements for confirmation of a chapter 13 plan is the

condition that the plan be feasible. Section 1325(a)(6) provides that visionary or

speculative chapter 13 plans not be approved. The feasibility requirement has been

analyzed in the following terms:

> To satisfy feasibility, a debtor's plan must have a reasonable
> likelihood of success, i.e., that it is likely that the debtor will
> have the necessary resources to make all payments as directed
> by the plan. 11 U.S.C. § 1325(a)(6). . . . The debtor carries
> the initial burden of showing that the plan is feasible. . . .
> Before confirmation, the bankruptcy court should be satisfied
> that the debtor has the present as well as the future financial
> capacity to comply with the terms of the plan.

In re Fantasia, 211 B.R. 420, 423  (B.A.P. 1st Cir. 1997) (citations omitted); see In re

Scott, 188 F.3d 509 (table), 1999 WL 644380, at *1 (6th Cir. 1999); In re Harris, 199

B.R. 434, 436 (Bankr. D.N.H. 1996) (feasibility requires that the proposed chapter 13

plan have a likelihood of success).

Typically, a chapter 13 debtor meets her burden of demonstrating the

16

viability of a chapter 13 plan based upon future income by showing a stable employment

history, present employment, and a current net monthly income level sufficient to make

proposed plan payments. See, e.g., In re Nottingham, 228 B.R. 316, 321 (Bankr. M.D.

Fla. 1998). Absent a showing that the chapter 13 debtor will likely have sufficient

income to fund her proposed plan, confirmation will be denied. See, e.g., In re Scott,

1999 WL 644380, at *1 ("Without a credible basis to find that he could pay the $100 per

month that his plan required, the plan could not be confirmed."); In re Cherry, 84 B.R.

134, 139 (Bankr. N.D. Ill. 1988); In re McGowan, 9 B.R. 329, 330 (Bankr. E.D. Pa. 1981)

("Since the debtors have offered no evidence to show that they will be able to obtain the

necessary refinancing, we conclude that it does not appear that they will be able to fund

the plan as proposed"); In re Gale, 8 B.R. 960, 962 (Bankr. D. Md. 1981) (confirmation

of chapter 13 plan is denied because future plan payments were "conjectural at best.").

        In addition, some courts have concluded that the failure of a chapter 13

debtor to propose a plan that addresses likely future contingencies should be denied

confirmation, based upon a lack of feasibility. See, e.g., In re Goodavage, 41 B.R. 742

(Bankr. E.D. Va. 1984) (failure to provide for likely medical expenses); In re Jones, 10

B.R. 128 (Bankr. E.D. Va. 1981) (confirmation is denied where the court found a budget

unrealistic for not including amounts for home maintenance or automobile insurance, and

little for recreation or food and clothing); In re Hockaday, 3 B.R. 254 (Bankr. S.D. Cal.

1980) (confirmation is denied where the debtor only budgeted $10 for emergencies); see

17

also In re Smith, 207 B.R. 888, 890 (B.A.P. 9th Cir. 1996) ("In cases where the debtors

have very young or handicapped dependents, the absence of a budget for life insurance

may call a Chapter 13 plan into question.").

In this dispute, I conclude that Ms. Foley's second amended proposed

chapter 13 plan cannot be confirmed, as she has not met her burden under section

1325(a)(6). She proposes to pay a total of $27,500 to the trustee, but the evidence reflects

that she has a prepetition mortgage delinquency of at least $17,448.38 in missed

prepetition payments and late fees alone, without consideration of property tax shortfalls

repaid by the mortgagee, as well as foreclosure costs and fees.[10] Moreover, she has

committed to pay HSBC a total of $11,317 as part of her reorganization plan, and must

pay administrative and priority claims of $3,622, see 11 U.S.C. § 1322(a). These

obligation alone, not including the trustee's commission under 28 U.S.C. § 586(e), total

more than $32,000. Accordingly, without considering whether the mortgagee's various

---

[10]When litigation is pending at the time of the confirmation hearing, the debtor's burden
might include establishing the likely success in that litigation as bearing on the feasibility of her
plan under section 1325(a)(6). See In re Yeager, 2004 WL 422049, at *3 (Bankr. E.D. Pa. 2004);
see also In re Shields, 148 B.R. 783 (Bankr. E.D. Pa. 1993) (chapter 13 plan that is premised
upon the debtor's setting aside of a foreclosure sale is not feasible when there is no likelihood
that the foreclosure sale will be set aside). Moreover, the confirmation process need not await
the outcome of that litigation. See generally In re Bell, 314 B.R. 54, 61 n.5 (Bankr. E.D. Pa.
2004) (determination of confirmation should not be delayed by pendency of an adversary
proceeding); cf. In re Rocco, 255 Fed. Appx. 638, 641 (3d Cir. 2007) (non-precedential)
(pendency of a lawsuit against a secured creditor is, generally, "too speculative in nature to offer
adequate protection.").

Here, there was no evidence offered that the debtor's district court action was likely to
result in the rescission of the Option One mortgage or assessment of damages. Thus, I do not
consider whether the debtor's proposed plan would meet the requirements of section 1325(a)
were rescission granted.

18

costs, fees and escrow charges should be allowed, or including the trustee's 10%

commission, the plan is underfunded and thus not confirmable.  See, e.g., In re Patton,

388 B.R. 629, 636 (Bankr. E.D. Pa. 2008).

Furthermore, the record reflects that the debtor had difficulty complying

with her original plan payment of $250 per month, is now separated from her husband

thus reducing household income, has numerous unexplained reductions in expenses

between her first and amended Schedule J, implicitly suggests that in the next four years,

she will have no expenditures for common occurrences such as home maintenance and

clothing, and fails to include among her expenses the additional $261.11 due Hyundai

Motor Finance for the next six months, as promised by stipulation.

These failings cause me to conclude that, even if the proposed second

amended plan were sufficiently funded, the debtor is unlikely to be able to tender $500

per month for more than four years, while meeting all of her promised obligations to

secured creditors and her normal monthly expenses for a household of four.  See, e.g., In

re Nalls, 2007 WL 988039, at *3 (Bankr. N.D. Ala. 2007) ("[T]he expenses listed on the

Amended Schedule J are unrealistically low and appear to be incomplete—no amount is

shown for home maintenance, clothing, medical or prescription expenses, or

transportation [i.e. gas for the vehicle, a 2000 Ford Expedition, which was in the plan and

to be paid through the Trustee]. The Motion to Modify is due to be denied based on the

lack of feasibility of the proposed, modified plan."); In re Marett, 1996 WL 33340790, at

19

*13 (Bankr. D.S.C. 1996) ("A proposed plan is not feasible if the ongoing living expenses

proposed by the debtor are unrealistically low and there is not sufficient income to pay

realistic and reasonable ongoing living expenses.") (citations omitted); see generally In re

Yeager, 2004 WL 422049, at *2 (Bankr. E.D. Pa. 2004) (unexplained, unpersuasive

amendments to net income undermine the chapter 13 debtor's burden to demonstrate plan

feasibility).

Accordingly, confirmation of the second amended plan shall be denied.


B.


The debtor argues vigorously that Option One has not met its evidentiary

burden to support its secured proof of claim.  Moreover, she maintains that she ultimately

will prevail in her federal court litigation against Option One, and thereby eliminate or

substantially reduce its secured claim.  If so, then much less would be needed by the

debtor to fund a viable chapter 13 plan.

The issue of evidentiary burdens in proof of claim litigation was addressed

by the Third Circuit Court of Appeals in In re Allegheny Int'l, Inc., 954 F.2d 167, 173-74

(3d Cir. 1992), and more recently considered by two colleagues in In re Patton, 388 B.R.

629 (Bankr. E.D. Pa. 2008) (Sigmund, B.J.) and In re Sacko, 2008 WL 4268248 (Bankr.

E.D. Pa. 2008) (Frank, B.J.).  I find no need to fix with precision the amount of the

20

mortgagee's allowed secured claim in this instance, and accordingly no need to determine

whether the debtor or Option One met their respective burdens of production or

persuasion.

As noted above, I found credible the mortgagee's assertion that the debtor

was substantially delinquent in prepetition mortgage payments, that such payments

increased by virtue of the adjustable note signed by the debtor, and that the prepetition

arrearages exceeded $17,000.[11]  Given the debtor's agreements in this bankruptcy case

with two secured auto loan creditors, her priority claims, the trustee's statutory

commission, and a realistic assessment of her monthly net income and expenses, she has

no present ability to fund a chapter 13 plan that provides for her all her secured and

priority creditors.[12]  Whether Ms. Foley will succeed in her district court challenge to

Option One's mortgage is not known at present.  She has not prevailed in the district

court, and I have no power to overrule that decision nor any basis to opine that her future

appeal will be successful.  See generally In re Ewald, 298 B.R. 76, 81 (Bankr. E.D. Va.

2002).

In advocating that I dismiss this case at this stage, the trustee argues:

This case was filed about ten months ago and the debtor is no
closer to obtaining confirmation now than she was when the

---

[11]The debtor, in her posthearing memorandum, argues that one could "charitably" allow
the secured claim in the amount of $18,708.  Debtor's Memorandum, at 5.

[12]As neither the trustee nor any unsecured creditor has raised any issues under section
1325(b), I do not consider them.

case was filed. The debtor would like all of her creditors to
wait until a final resolution of the appeal process. Therefore,
there is additional cause to dismiss this case resulting from the
unreasonable delay of the debtor (11 U.S.C. §1307(c)). It has
been about ten months since the filing of this case and the
debtor would have all parties waiting for an additional
unknown period of time. The trustee is unwilling to wait for
this unknown period of time. Accordingly, the trustee
requests that confirmation be denied and the case be
dismissed.

Trustee's Memorandum, at 3.

In general, when confirmation of a chapter 13 debtor's proposed plan has

been denied, as occurred here, and when the evidence demonstrates that the debtor is

unlikely to be able to propose in the near future a feasible, viable chapter 13 plan, there is

no legitimate purpose in continuing the chapter 13 case as reorganization is futile, and

dismissal (or conversion to chapter 7) is warranted under section 1307(c). See, e.g., In re

Scott, 188 F.3d 509 (table), 1999 WL 644380 (6th Cir. 1999); In re Barrett, 149 B.R. 494,

498 (Bankr. N.D. Ohio 1993) ("In view of this history there is simply no basis on which it

appears plausible for the Debtor to bear these increased costs while at the same time

finding money to maintain his house and meet his other living expenses. Therefore,

Debtor's case will be dismissed under section 1307(c)(5) of the Bankruptcy Code as well

as under section 1307(c)(1) of the Code"); see also Kantak v. Fiato, 29 B.R. 44, 46

(D.N.M. 1983) ("Until appellants can approach the bankruptcy court with a plan that

proposes to pay their debts with assets to which they have clear title, the court has cause

to dismiss their case.").

22

In light of the debtor's present limited financial circumstances, her ability to reorganize appears dependent upon her successful challenge to Option One's mortgage, now pending in district court. Until that litigation is resolved, there is no legitimate purpose served in further administering this chapter 13 case. Therefore, the trustee's motion to dismiss shall be granted under section 1307(c)(5). See generally In re Wile, 310 B.R. 514, 518-19 (Bankr. E.D. Pa. 2004) (undue delay warranted relief under section 1307(c)(5)).[13]

An appropriate order will be entered.

*Bruce Fox*

_____

BRUCE FOX
United States Bankruptcy Judge

Dated: October 2, 2008.

---

[13]At the dismissal hearing, debtor's counsel argued that she preferred conversion to chapter 7 rather than dismissal. In her posthearing memorandum, however, she makes no reference to conversion. Thus, she may no longer have such a preference or, if so, the issue may be waived. See generally In re Henderson, 134 B.R. 147, 155 (Bankr. E.D. Pa. 1991); see also Paris Utility Dist. v. A.C. Lawrence Leather Co., 665 F. Supp. 944, 958 n. 15 (D. Me. 1987) ("In its complaint, the District also sought recovery for certain clean-up costs incurred in 1986. The District has, however, failed to address this claim in its post-trial briefs, the Court thus considers the claim to have been waived."), aff'd, 861 F.2d 1 (1st Cir. 1988). Even were the issue not waived, there was no showing that creditors and the debtor would benefit from conversion rather than dismissal. (Indeed, were this case converted, the debtor's interest in the district court litigation would be succeeded by a chapter 7 trustee, who might resolve it on terms disapproved of by the debtor.)